IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-00355-PAC-BNB

OSCAR U. SOMOZA and MIRIAM BORNSTEIN-GOMEZ,

       Plaintiffs,

v.

UNIVERSITY OF DENVER,
BOARD OF TRUSTEES OF THE UNIVERSITY OF DENVER,
HELGA WATT, in his individual capacity,
LUC BEAUDIN, in his individual capacity, and
JAVIER TORRE, in his individual capacity,

       Defendant(s).

---

MEMORANDUM OPINION AND ORDER

---

Patricia A. Coan, United States Magistrate Judge

      Plaintiffs, Oscar Somoza and Miriam Bornstein-Gomez, who are Hispanic tenured professors of Spanish at the University of Denver, bring an action under 42 U.S.C. §1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, as amended, for disparate treatment, retaliation, and hostile work environment on the basis of their race/national origin.  Plaintiffs also seek relief under the Colorado Anti Discrimination Act, COLO.REV.STAT. ("C.R.S.") §24-34-402(1), and assert claims of negligent supervision and breach of contract.  Jurisdiction is premised upon 28 U.S.C. §1331, §1343, and §1367.

      The parties have consented to determination of this case by a United States Magistrate Judge under 28 U.S.C. §636(c).  The matter before me  is Defendants' Motion

for Summary Judgment, filed February 23, 2006.  The motion is fully briefed. I heard oral

argument on May 15, 2006.

I.

Defendants move for summary judgment on all of plaintiffs' claims.  Summary

judgment is appropriate under Fed.R.Civ.P. 56(c) when the "pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show

that there is no genuine issue as to any material fact and that the moving party is entitled

to a judgment as a matter of law."   The movant bears the initial burden to "point to those

portions of the record that demonstrate an absence of a genuine issue of material fact

given the relevant substantive law." *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d

1022, 1024 (10th Cir. 1992).  If this burden is met, the nonmovant must show that there are

genuine issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986); *see, also, Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th

Cir. 1993)(internal citations omitted)(nonmovant must "come forward with specific facts

showing that there is a genuine issue for trial as to elements essential to [the nonmovant's

claim]").  The court views the evidence of record and draws all reasonable inferences in

the light most favorable to the nonmovant. *Thomas v. International Business Machines*,

48 F.3d 478, 484 (10th Cir. 1995).  To defeat a properly supported motion for summary

judgment, "there must be evidence upon which the jury could reasonably find for the

plaintiff." *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995)(quoting

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  Conclusory allegations will

not create a genuine issue of material fact necessitating trial. *White v. York Int'l. Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

Defendants submitted new evidence in their reply brief to support their summary judgment motion.   A court may rely on new evidence submitted in support of a Reply brief as long as the plaintiffs are not precluded from filing a sur reply. *See Pippin v. Burlington Resources Oil and Gas Co.*, 440 F.3d 1186, 1192  (10th Cir. 2006)("[I]f the court relies on new materials or new arguments in a reply brief, it may not forbid the nonmovant from responding to these new materials")(internal quotation omitted).   Defendants filed their reply brief on April 27, 2006.   Plaintiffs had ample time before the May 15, 2006 oral argument to move for leave to file a sur reply, but did not do so, nor did plaintiffs request permission to file a sur reply brief at the hearing.   Under the circumstances, I may rely on the new evidence.[1]   *See Pippin*, 440 F.3d at 1192.

II.

The following facts are undisputed, or if disputed, are construed in plaintiffs' favor in this summary judgment proceeding.   Plaintiffs are married, Hispanic tenured faculty members at the University of Denver ("D.U.").   (Plaintiffs' Response, Deposition of Oscar Somoza, at 39, 180; Deposition of Miriam Bornstein-Gomez, at 12; Amended Compl., at ¶¶10, 14)   Plaintiffs Somoza and Bornstein-Gomez have taught in D.U.'s Department of Languages and Literature ("Department") since 1979 and 1988, respectively.   (Somoza Deposition, at 8; Bornstein-Gomez Deposition, at 10-12)

---

[1]I note, however, that I rely substantially on the evidence attached to Defendants' Motion for Summary Judgment ("MSJ") and Plaintiffs' Response Brief in deciding whether summary judgment is warranted.

The Department consists of several sections, including Spanish, French, German, Russian, Italian, Japanese, Chinese, and Classics. (MSJ, Affidavit of Gregg Owen Kvistad, at ¶2; Plaintiffs' Response, Affidavit of Dr. Ralph DiFranco, at ¶5) Dean Gregg Kvistad headed the Divisions of Arts, Humanities and Social Sciences, which includes the Department, from July 1998 through June 2005. (Kvistad Affidavit, at ¶1) Defendant associate professor Helga Watt chaired the Department from September 1998 through December 2000. (MSJ, Deposition of Helga Watt, at 20) Defendant assistant professor Luc Beaudin chaired the Department from June 2001 through June 2004. (MSJ, Deposition of Luc Beaudin, at 27, 29)

Plaintiffs, Ralph DiFranco (Italian-American), defendant Javier Torre (Spanish), and Susan Walter (Caucasian-American) were tenure-line faculty in the Spanish section during the relevant period. (Bornstein-Gomez Deposition, at 15-17) Torre and Walter are married and were non tenured professors at the time the Complaint was filed. (MSJ, Deposition of Javier Torre, at 9, 16; Bornstein-Gomez Deposition, at 212) The other tenure-line faculty in the Department are of European or Asian descent. (DiFranco Affidavit, at ¶4)

As a matter of historic practice, the Spanish section operated relatively autonomously within the Department, as did the other language sections, making programmatic, curriculum and hiring decisions, selecting the Basic Language Coordinator, and generally having a "significant voice" in tenure and promotion decisions affecting the Spanish section. (DiFranco Affidavit, at ¶¶5, 11)

The Spanish section has the highest student enrollment and the greatest number of faculty members within the Department. (DiFranco Affidavit, at ¶¶6-7; Somoza

4

Deposition, at 155; Bornstein-Gomez Deposition, at 15) The faculty designated Dr. Bornstein-Gomez to serve as section coordinator beginning in 1993. (DiFranco Affidavit, at ¶7)

According to plaintiffs, in the Fall of 1999, Helga Watt, then Department chair, began a campaign to erode and impair plaintiffs' ability to exercise influence in the Spanish section and to participate in decisions affecting that section.   (Bornstein-Gomez Deposition, at 22-23; Somoza Deposition, at 12-14) Plaintiffs base their assumption on the following statement Watt made to Carole Byrd in the Fall of 1999 while Byrd was a visiting professor at D.U.: "I don't like Spanish people.  They have too much power and I'm going to do something about it." (Plaintiffs' Response, Affidavit of Dr. Carole Byrd, at ¶17)  Watt was friends with and a mentor to Luc Beaudin, who succeeded Watt as Department Chair.  (Beaudin Deposition, at 31; Watt Deposition, at 30) Dean Kvistad was also a mentor to Beaudin and considers him a friend.  (MSJ, Deposition of Gregg Kvistad, at 39-41)  Chair Beaudin also maintained close friendships with Department faculty members Catherine O'Neil, Sieglinde Lug and Jennifer Pap. (Beaudin Deposition at  31-32, 74-75)  Plaintiffs claim that Watt implemented her agenda through Chair Beaudin from July 2001 through July 2004 and through other Department faculty with whom Watt was friendly including Lug, Pap, O'Neil, Susan Stakel, Frederique Chevillot, Javier Torre and Susan Walter.

A.      Erosion of Plaintiffs' Privileges of Employment

In the Spring of 2001, a tenure-line faculty vacancy existed in the Department after a German professor retired.  (Somoza Deposition, at 15) The Spanish section proposed that the tenure line be brought into the Spanish section.  (Bornstein-Gomez Deposition,

at 23-25)  The tenure-line position was awarded to the Russian section in the Fall of 2001,

without any further discussion between the Department faculty and the Department Chair.

(Somoza Deposition, at 18-21)  Prior to that time, the Russian section had only one tenure-

track position. (Beaudin Deposition, at 49)

In the Fall of 2001, Professor Frances Mecartty, an assistant professor in the

Spanish section, was being considered for tenure.  (Bornstein-Gomez Deposition, at 31-

32) A tenure and promotion ("T &  P") committee composed of four professors from the

Spanish section – plaintiffs and professors DiFranco and Torre – and one professor from

the Classics section – professor Castellani – considered Mecartty's candidacy.  (*Id.* at 32)

The committee voted unanimously to deny tenure.  (*Id.* at 35) Mecartty appealed and a

Department review committee, which consisted of faculty from other sections of the

Department,[2] vacated the recommendation of the T & P committee for failure to give

Mecartty adequate consideration.  (*Id.* at 37) A reconsituted committee, chaired by Helga

Watt, then convened to reconsider Mecartty's bid for tenure and that committee voted in

favor of tenure.  (*Id.* at 37-38)

On May 20, 2002, Dean Kvistad and Chair Beaudin met with plaintiffs and professor

DiFranco and, without giving plaintiffs an opportunity to speak or to defend themselves,

"chastised" and "reprimanded" the plaintiffs for their decision to deny Mecartty tenure.

(Somoza Deposition, at 22-27; Bornstein-Gomez Deposition, at 91-94, 186; DiFranco

Affidavit, at ¶12).  Kvistad also reprimanded professor DiFranco, but did not reprimand

---

[2]No one from the Spanish section served on the review committee because all eligible
professors in the Spanish section had already served on the initial T & P Committee.  (Bornstein-Gomez
Deposition, at 35-37)

Torre or Castellani (the other members of the T & P committee who voted to deny Mecartty tenure). (Bornstein-Gomez Deposition, at 123-24; Somoza Deposition, at 22-23)

Because of dissension in the Department over Mecartty's bid for tenure, Chair Beaudin proposed an amendment to the Department's bylaws to ensure that no section in the Department could have more than fifty per cent participation on tenure and hiring committees. (Beaudin Deposition, at 119-120, 122) The Department adopted the amendment by a majority vote in May of 2002. (Beaudin Deposition, at 147; Amended Bylaws, MSJ Ex. 7) The amended bylaws affect each section in the Department. (Beaudin Deposition, at 139) According to Beaudin, the amendment was "designed so that the department could function as a whole," and was an effort to "bring back harmony [and] discourse in the department." (Beaudin Deposition, at 117, 119)

In 2003, the Department had an opening for an assistant professor position in the Spanish section. The candidate search committee consisted of Professor Beaudin, plaintiff Somoza from the Spanish section, and Professor O'Neil from the Russian section. The two finalists under consideration were Susan Walter, defendant Torre's wife, who was then a lecturer in the Spanish section, and an external candidate. (Somoza Deposition, at 50-51) The search committee was unable to reach a consensus on a candidate and proposed to Dean Kvistad that the search be suspended until the following year. (*Id.* at 52, 56-57) In February 2004, the Department convened a meeting to inquire into the recommendation of the search committee. (Somoza Deposition, at 183) A majority of the Department voted to reopen the search process so that the two finalists would be reconsidered by the search committee. (*Id.* at 72-75) Plaintiff Somoza testified in his

7

deposition that during the Department meeting, his colleagues of European descent were disrespectful, made rude remarks, and "rolled their eyes" while plaintiff Somoza explained, at their insistence, his criteria for assessing Susan Walter's candidacy. (*Id.* at 71, 184-85) Chair Beaudin and Professor O'Neil, the other Department members who served on the search committee, were not asked to explain their decision-making process. (*Id.* at 185) Ultimately, the original search committee, including plaintiff Somoza, voted unanimously in favor of professor Walter, under pressure from the other Department faculty members. (*Id.* at 77)

Plaintiffs also complain about the process used to fill the lecturer position vacated by Susan Walter after Walter was hired as an assistant professor in the Spanish section. (Somoza Deposition, at 207-208, 255-56) Wendy Mendez (Hispanic), was first hired as a lecturer for the Spanish section in May of 2002. (*Id.* at 207-208) According to plaintiff Somoza, Mendez was hired again in the Spring of 2003, without a job description, and after Chair Beaudin changed the position back and forth from temporary to permanent several times and did not use a search committee during the hiring process. (*Id.* at 207-209). Plaintiffs complained to Chair Beaudin that Mendez was subjected to a more rigorous process than other permanent lecturer candidates and was treated unfairly. (*Id.* at 213-216; Bornstein-Gomez Deposition, at 200-201)

Mendez was hired for a third time in 2004. (Bornstein-Gomez Deposition, 201-203, 208-09) Bornstein-Gomez was on the search committee that voted to hire Mendez, along with Torre from the Spanish section, and other members of the Department. (*Id.* at 203) Bornstein-Gomez testified in her deposition that some of the non-Hispanic members on

the search committee made comments about Mendez during the hiring process that were false and that were meant to tarnish Mendez' reputation before the committee voted. (*Id.* at 209-11)

In addition to the conduct described in the preceding paragraphs, plaintiffs also complain about the following: (1) Chair Beaudin appointed a temporary Basic Language Program Coordinator for the Spanish section without consulting plaintiff Bornstein-Gomez as section coordinator, despite the Spanish section's historic practice of consulting the section coordinator; (2) Chair Pap (who became Chair of the Department in the Fall of 2004) selected the Spanish section coordinator for 2004-05 without consulting plaintiff Bornstein-Gomez who had served in that position on a volunteer basis since 1993 (Amended Compl., 36; DiFranco Affidavit, at ¶7; Plaintiffs' Response Brief, at 22); (3) Chair Pap eliminated the Spanish section at a meeting on September 11, 2003; (4) Chair Pap prohibited the Spanish section faculty from convening meetings beginning in April of 2005 and continuing through the Fall semester of 2005, and only allowed the meetings to resume under her supervision (Bornstein-Gomez Deposition, at 236); (5) plaintiff Bornstein-Gomez's name was deleted from the Cultural and Critical Studies Program; (6) professor Sieglinde Lug did not invite plaintiff Bornstein-Gomez to women's studies dinners; and, (7) Professor Lug did not invite plaintiffs to attend a dinner at her home with a Mexican scholar which other Department colleagues attended. (Bornstein-Gomez Deposition, at 231; Byrd Affidavit, at ¶20)

B.     Plaintiffs' Workload and Merit Salary Increases

Plaintiffs claim that the unlawful disparate treatment, retaliation and racially hostile work environment is evidenced, in part, by their disproportionate workloads and low merit pay increases.

1.     Workload

The standard course load for tenured and tenure-track faculty in the Department is two courses for each of the three quarters during the academic year, totaling six courses per year.  (Kvistad Affidavit, at ¶3) Plaintiff Somoza taught five classes and an internship program, for which he received an annual course release, during the academic year 2002-2003.  (*Id.* at ¶4) Chair Beaudin, Dr. Watt, and Dr. O'Neil each taught at least seven classes that year.  (*Id.*)

The number of student credit hours taught is also a method of gauging a faculty member's workload.  (Kvistad Affidavit, at ¶4; Somoza Deposition, at 285) Each of the plaintiff's workload for the 2002-2003 academic year was at least thirty-five student credit hours less than the work load of professors Gilroy, Beaudin, Watt and O'Neil. (Kvistad Affidavit, at ¶¶4, 6, and attached Ex. 3-A) For the academic year of 2003-2004, plaintiff Somoza taught fewer credit hours than Professors Gilroy and Castellani, while plaintiff Bornstein-Somoza taught fewer credit hours than all but six of the seven Department tenure-line faculty who taught three quarters during that year.  (Kvistad Affidavit, ¶¶5, 7, and attached Ex. 3-B)

2.    <u>Merit salary increases</u>

Merit salary increases for tenure and tenure track faculty are based on faculty members' scholarly publications, teaching and service, and any equity issues.  (Kvistad Deposition, at 123-24, 127)  Professor Somoza did not publish between the 1998-1999 academic year and the 2002-2003 academic year. (Kvistad Affidavit, at ¶11, and attached Ex. 3-E)  Six other tenure-line professors in the Department published during the same time frame.  (*Id.*)  Plaintiff Bornstein-Gomez produced one scholarly publication in the 1998-1999 academic year, but did not publish anything else through academic year 2002-2003.  (Kvistad Affidavit, at ¶12, and attached Ex. 3-E) Associate professor Lug (German) was the only other professor, besides plaintiff Somoza, who did not publish between the 1999-2000 and 2002-03 academic years.  (Kvistad Affidavit, attached Ex. 3-E)  Lug published twice in the 1998-99 academic year.  (*Id.*)

Plaintiffs were notified of their 2003 and 2004 salary merit increases on December 20, 2002 and December 19, 2003, respectively.  (MSJ Exs. 9, 10)  Plaintiff Somoza received a 2.69% merit increase in January 2003 and plaintiff Bornstein-Gomez received a 2.71% merit increase.  (Kvistad Affidavit, at ¶¶9, 12, and attached Ex. 3-C) Associate professor Lug received a merit increase of 2.70%.  (*Id.*)

In January of 2004, plaintiff Somoza received a 2.55% merit increase plus a $750 bonus.  (Kvistad Affidavit, at ¶10, and attached Ex. 3-D)  Plaintiff Bornstein-Gomez received a 2.55% increase plus a $750 bonus.  (*Id.* at ¶13, and attached Ex. 3-D) Six of the remaining ten tenure-line faculty in the Department received lower merit salary

increases than the plaintiffs.  (*Id.* at 3-D)  Plaintiffs and associate professor Watt were the only Department faculty who received a bonus in 2004.  (Kvistad Affidavit, at ¶10)

Plaintiff Somoza is the highest compensated faculty member in the Department. (Kvistad Affidavit, at ¶8; Somoza Deposition, at 86)

C.      Plaintiffs' Discrimination Charges

Plaintiffs filed formal charges of discrimination and retaliation against D.U. with the Equal Employment Opportunity Commission ("EEOC") on December 1, 2003 and October 22, 2004, respectively, alleging national origin discrimination and retaliation.  The EEOC issued plaintiffs right to sue notices on August 26, 2005. (Amended Compl., at ¶8) Plaintiffs then filed suit in federal court, bringing Title VII and other claims.

III.

A.      Disparate Treatment on the Basis of Race/National Origin

Plaintiffs claim that defendants discriminated against them on the basis of their race/national origin with regard to the privileges and benefits of their tenured employment at D.U. in violation of Title VII and 42 U.S.C. §1981.  Plaintiffs maintain that defendants have engaged in a discriminatory campaign to "disenfranchise" plaintiffs' decision-making power within the Spanish section.

Title VII, 42 U.S.C. at 2000e-2(a)(1), prohibits race discrimination in employment. Section 1981 prohibits race discrimination in the making and enforcement of contracts. An employee may support a race discrimination claim under Title VII or §1981 with direct evidence of racial animus, or with indirect or circumstantial evidence of race discrimination. *Kendrick v. Penske Trans. Services, Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000); *Maldonado*

*v. City of Altus*, 433 F.3d 1294, 130 (10th Cir. 2006)(recognizing that elements of discrimination claims under Title VII and §1981 are identical).

The parties agree that I should apply the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973) for analyzing Title VII claims.[3]   Under *McDonnell Douglas Corp.*, the plaintiffs must first establish a prima facie case of race discrimination.  If plaintiffs meet their  burden, the employer must produce a legitimate, non-discriminatory justification for the challenged employment action.  If the employer satisfies its burden of production, the plaintiffs must point to evidence showing that the employer's proffered reason was a pretext for discrimination.  *Stover v. Martinez*, 382 F.3d 1064, 1070-71 (10th Cir. 2004).

To establish a prima facie case of employment discrimination under Title VII and §1981 under the circumstances presented here, each plaintiff must show that: (1) he or she belongs to a protected class; (2) he or she suffered an adverse employment action; and (3) that the adverse employment action occurred under circumstances giving rise to an inference of discrimination.  *Hysten v. Burlington Northern and Santa Fe Ry. Co.*, 296 F.3d 1177, 1181 (10th Cir. 2002).

Defendants argue that they are entitled to summary judgment on plaintiffs' disparate treatment claims under Title VII and §1981 because plaintiffs cannot show that they were subjected to any adverse employment action; or, that the complained of actions occurred under circumstances giving rise to an inference of discrimination.

---

[3]Plaintiffs apparently concede that they do not have any direct evidence of race discrimination.

Employer conduct may be an adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).   The Tenth Circuit "liberally defines the phrase 'adverse employment action.' " *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir.1998).  It is "not simply limited to monetary losses in the form of wages or benefits. Instead, we take 'a case-by-case approach,' examining the unique factors relevant to the situation at hand." *Id.* (citation omitted). Nevertheless,  "'a mere inconvenience or an alteration of job responsibilities'" is not an adverse employment action." *Sanchez*, 164 F.3d at 532 (quoting *Crady v. Liberty Nat'l Bank-Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993)); *see, also, MacKenzie v. City and Cnty of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005)("[N]ot everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit")(internal quotations and citation omitted).

Plaintiffs cite numerous examples of conduct which they argue constitute adverse employment actions, either separately, or in the aggregate.   I address each of the objectionable acts below.

1.   <u>Adverse employment actions excluding merit salary increases</u>[4]

Plaintiffs first complain that they suffered an adverse employment action when an open tenure-line position was arbitrarily awarded to the Russian section, after the Spanish section had asked for it, without any discussion or input from the Spanish section. However, plaintiffs fail to explain how the denial of a new tenure line position adversely affected their individual employment status.  Instead, the decision impacted the Spanish section as a whole, which included three other non-Hispanic faculty members, not just the plaintiffs.

Plaintiffs next complain about being reprimanded orally by Dean Kvistad for their decision to vote against professor Mecartty's tenure bid.  A reprimand can constitute an adverse employment action if it adversely affects the terms and conditions of a plaintiff's employment – for example, if it affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or impacts the plaintiff's future employment opportunities. See *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998); *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir.1996).

The only action the University took in connection with the reprimand was to amend the bylaws so that each section of the Department has no more than fifty per cent representation on certain hiring and tenure and promotion committees.  On its face, the amendment affects all Department sections equally.  Moreover, plaintiff Bornstein-Gomez conceded in her deposition that professor DiFranco, a non Hispanic, was also reprimanded

---

[4]I address plaintiffs' claims involving the merit salary increases separately because defendants argue that those claims are time-barred.

at the meeting.  I find that Dean Kvistad's oral reprimand was not an adverse employment action because it did not undermine each plaintiff's individual employment status at D.U. in any way.  Moreover, the reprimand did not occur under circumstances giving rise to an inference of discrimination because DiFranco, a non Hispanic, was also reprimanded.

Plaintiffs complain that their colleagues and Chair Beaudin scrutinized and "reversed" plaintiffs' hiring decisions involving Susan Walter and Wendy Mendez. The evidence shows, however, that plaintiffs participated in the Departmental committee process involving Walter's hiring.  To the extent that plaintiffs' colleagues' majority vote in favor of hiring Walter can be considered a "reversal" of plaintiff Somoza's position that the search for an assistant professor should be postponed, I find that the evidence shows that Somoza ultimately voted in favor of hiring Walter, although he did so grudgingly.  Plaintiff Somoza's assertion that his  reputation and influence were "tarnished and diminished" as a result of that hiring process, and that his Department colleagues were rude to him during a Department meeting when hiring Walter was discussed, are insufficient to establish a material factual dispute about whether plaintiffs suffered an adverse employment action. *See Forkio v. Powell,* 306 F.3d 1127, 1130-31 (D.C.Cir. 2002)(public humiliation and loss of reputation are not adverse employment actions).

Moreover, there is no evidence to show that plaintiffs' Departmental colleagues "reversed" plaintiffs' hiring decisions involving Wendy Mendez.   Plaintiffs fail to provide any evidence that their colleagues' actions in subjecting Mendez to scrutiny during her hiring processes led to adverse employment actions affecting plaintiffs.

The crux of plaintiffs' disparate treatment claim is their loss of control over hiring, tenure, curriculum, and programmatic decisions in the Spanish section. Plaintiffs maintain that Chair Beaudin orchestrated an amendment to the Department bylaws in May of 2002 and that he then applied that amendment disparately to ensure that other sections in the Department were allowed to maintain control over their own affairs, while preventing the faculty in the Spanish section from doing the same. Plaintiffs cite the following as examples when the amended bylaws were allegedly applied disparately, or ignored altogether, with the intent to diminish plaintiffs' influence over decisions in the Spanish section: (1) in 2003, Chair Beaudin convened a committee for an assistant professor position in the Spanish section (Susan Walter hire) which did not have fifty per cent Spanish section representation – instead, the committee was composed of two members from the Russian section (including Chair Beaudin) and one member from Spanish; (2) Chair Beaudin failed to prepare a job description for a lecturer position in the Spanish section in March of 2003 (Wendy Mendez - second hire) and did not convene a committee which included plaintiffs; (3) Chair Beaudin allowed professor Torre to sit on the search committee for Wendy Mendez' third hiring process in the Fall of 2003, even though no one had nominated Torre; (4) Chair Beaudin secretly recruited members for Torre's pre-tenure committee in Fall of 2003; and, (5) Chair Beaudin required the Spanish section to convene a Department committee for a lecturer hire in February-March of 2004, while allowing the German section to hire its own lecturer.

Two of plaintiffs' claimed bylaws' violations are refuted by the record. Plaintiffs' contention that defendants violated the bylaws when the German section hired a

temporary lecturer without observing the "fifty per cent" rule is without merit.  While the hiring of continuing lecturers is subject to the bylaws' requirement that "[a] maximum of 50% representation on the committee shall be from the section in which the new faculty member/s will serve [with the Department chair serving as chair of the hiring committee]" (Article VII(2)(B)[5]), the hiring of temporary lecturers is not subject to that restriction.  (MSJ Ex. 7, at Art. VII (2); Beaudin Deposition, at 150-51)

Plaintiffs' argument that defendants violated the amended Department bylaws concerning the composition of the hiring committee for the assistant professor position (Susan Walter hire) is also without merit.  The parties agree that there were three members of that committee: Dr. Somoza from the Spanish section, Dr. O'Neil from the Russian section, and Chair Beaudin, who also happened to be affiliated with the Russian section.  The committee's composition conformed with the bylaws' requirement of fifty per cent representation from the Spanish and Russian sections, with the Department chair serving as chair of the hiring committee.  The amended bylaws do not exclude Beaudin as chair of the hiring committee because he shares the same sectional affiliation as one of the committee members.

I further find, however, that there is a factual dispute about whether Chair Beaudin may have violated the amended Department bylaws at certain times.[6]  However, I do not find that those events are material for purposes of resolving defendants' summary judgment motion because any violations of the amended bylaws would have affected all

---

[5]Defendants' MSJ, Ex. 7.

[6]I note that defendants submitted evidence to refute some of the alleged violations of the amended Department bylaws, but not others.

18

faculty in the Spanish section, not just plaintiffs, and even if proven to be true, cannot sustain plaintiffs' prima facie case of disparate treatment in employment on the basis of the plaintiffs' race/national origin. Moreover, the evidence establishes that the plaintiffs ultimately did have a voice in the hiring decisions at issue, or that plaintiffs' hiring preferences prevailed, even if there was not strict compliance with the bylaws.

For example, plaintiffs complain that Wendy Mendez, who is also Hispanic, was subjected to a more rigorous hiring process than other lecturers, and that regular processes were not followed in her case.  The evidence shows that Mendez was hired originally in 2002 and that her annual contract had been renewed twice at the time the Complaint was filed.  Although plaintiffs may not have individually voted  in each of the hiring decisions involving Mendez, plaintiffs' deposition testimony establishes that Mendez was the plaintiffs' choice to fill the lecturer position and that she finally was placed in the position.

In addition, plaintiffs have failed to show how Torre's pre-tenure review committee process affected plaintiffs' employment adversely.  Plaintiffs admit that they were offered the opportunity to participate on Torre's pre-tenure review committee, but they declined to do so. (Somoza Deposition, at 226; Bornstein-Gomez Deposition, at 176, 178).

 Accordingly, I find that plaintiffs have failed to establish a material factual dispute about whether they suffered any adverse employment action concerning Chair Beaudin's application of the amended bylaws.

In addition, I find that the following acts do not constitute adverse employment actions: (1) Chair Beaudin's appointment of a temporary Basic Language Program

Coordinator for the Spanish section without consulting plaintiff Bornstein-Gomez as section coordinator, in accordance with the Spanish section's long-standing practice; (2) Chair Pap's selection of the Spanish section coordinator for 2004-05, the volunteer position that plaintiff Bornstein-Gomez had held since 1993; (3) Chair Pap's elimination of the Spanish section at a meeting on September 11, 2003; (4) Chair Pap's decision not to allow the Spanish section faculty to convene meetings from April of 2005 through the Fall semester of 2005; (5) Chair Pap's monitoring of Spanish section meetings after she allowed the meetings to resume; and (6) the deletion of plaintiff Bornstein-Gomez's name from the Cultural and Critical Studies Program.[7]   *See Ruggieri v. Harrington,* 146 F.Supp.2d 202, 217 (E.D.N.Y. 2001)(holding that plaintiff did not suffer an adverse employment action as a result of being denied the opportunities to serve as department chair and to teach certain summer courses because plaintiff was not entitled to those opportunities simply based on her status as a tenured professor); *Mitchell v. Vanderbilt University*, 389 F.3d 177, 182 (6th Cir. 2004) (holding that allegations that University deprived plaintiff of a graduate research position assistant during one summer, revoked his mentor status in the M.D./Ph.D graduate program, and removed him from his position of Medical Director of Pathology Laboratory Services did not amount to adverse employment actions, independently or collectively); *accord Demuren v. Old Dominion Univ.*, 33 F.Supp.2d 469, 483-84 (E.D.Va.), *aff'd*, 188 F.3d 501 (4th Cir.1999) (expressing doubt about whether plaintiff's exclusion from the Dean Search Committee, failure to

---

[7]I note that plaintiffs cannot base their national origin discrimination claims on actions taken by Chair Pap after October 22, 2004, the date of plaintiffs' last EEOC charge, because plaintiffs did not exhaust administrative remedies for the alleged discriminatory conduct.   *See* discussion in text at pp. 31-32, *infra.*

receive 1996 University Outstanding Research Award, and failure to receive Eminent Scholar status  qualified as adverse employment actions).  There is no evidence that any of these actions affected the status of the plaintiffs' employment as tenured professors, or impacted their future advancement opportunities.  Moreover, any action which affects all professors in the Spanish section does not give rise to an inference of discrimination because three professors in the section are not in the protected class.

Plaintiffs also claim that D.U. has allowed defendant Torre, their Spanish section colleague, to harass the plaintiffs and to create a hostile work environment for them.  Plaintiffs assert that Torre has refused to work with them in conducting section business, interferes with section business whenever possible, and has been openly hostile toward plaintiffs ever since plaintiffs opposed the hiring of Torre's wife, Susan Walter, for an assistant professorship position in 2003.  (Bornstein-Gomez Deposition, at 175; Plaintiffs' Response, Ex. 21)  Plaintiffs claim that Torre's hostility and harassment worsened after plaintiffs accused Torre of ethical improprieties during Wendy Mendez' third hiring process when Torre failed to disclose his friendship with an outside candidate and misrepresented the strength of the candidate's language skills to other faculty in the Department when asked.  (Bornstein-Gomez Deposition, at 219-221)

Coworker hostility or retaliatory harassment may constitute an adverse employment action if it is sufficiently severe.  *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005) (citing *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir.1998)).  Here, the record shows that Torre has treated plaintiffs rudely and with disrespect.  I find, however, that Torre's behavior, as described by plaintiffs, although

mean and unprofessional, does not rise to a level of conduct that affected the terms and conditions or privileges of the plaintiffs' employment.

Likewise, evidence that plaintiffs' colleagues did not invite them to faculty dinners hosted by their co-workers and that some of plaintiffs' co-workers refused to speak to them is inadequate to create a triable factual dispute about the existence of an adverse employment action.  *See MacKenzie*, 414 F.3d at 1279 ("[M]ere passive treatment does not constitute an adverse employment action); *Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir.1998) (concluding that "shunning" was not an adverse employment action where the plaintiff did not allege that the ostracism resulted in a reduced salary, benefits, seniority, or responsibilities); *Duncan v. Manager, Dep't of Safety*, 397 F.3d 1300, 1314 (10th Cir. 2005)(ostracism by plaintiff's fellow police officers was not an adverse employment action); *Bickerstaff v. Vassar College*, 354 F.Supp.2d 276, 281 (S.D.N.Y. 2004), *aff'd on other grounds in* 160 Fed.Appx. 61 (2d Cir. (N.Y.) 2005)("Exclusions from meetings or social functions do not constitute adverse [employment] actions.")

In addition, although plaintiffs assert in their Response brief that Chair Beaudin precluded them from making programmatic and operational decisions for the Spanish Abroad program, curriculum, and developing programs, plaintiffs do not point to any evidence to support their assertions, nor to any evidence from which a reasonable fact finder could conclude that any of the conduct complained of is an adverse employment action.

Plaintiffs next claim that their workload was increased during the academic years 2002-2003, and 2003-2004.  However, the unrefuted evidence shows that plaintiffs'

workload was lighter than several of their non Hispanic colleagues in the Department. *See* pp. 9-10. Accordingly, plaintiffs have not established the existence of any disputed issue of material fact on this claim. *See Jones v. Barnhart*, 349 F.3d 1260, 1269-70 (10th Cir. 2003)(holding that employee's generalized and unsubstantiated claims of an increased workload were insufficient to rise to the level of an adverse employment action).

Plaintiff Bornstein-Gomez also claims that she suffered an adverse employment action because she was not compensated for her duties as a volunteer section coordinator in the Spanish section for nine years. The record establishes that Bornstein-Gomez voluntarily assumed those duties of her own accord. (Bornstein-Gomez Deposition, at 30-31) Moreover, there is no evidence that any other language section coordinators in the Department are compensated for assuming that volunteer position or for similar positions. Accordingly, plaintiffs have failed to show an adverse employment action with respect to the volunteer position.

Finally, plaintiffs argue that even if none of the individual acts constitute an adverse employment action, the incidents, when considered collectively, are actionable. The Tenth Circuit has recognized that "[t]here may be circumstances where inconveniences, alterations of job responsibilities, lower performance reviews, and insufficient recognition for outstanding work considered individually are insufficient to demonstrate an adverse employment action, yet when considered together, amount to an adverse employment action." *Stover*, 382 F.3d at 1075.

In *Stover,* the plaintiff complained that she was given a lower performance evaluation than she had previously received; denied an offer for a promotional position;

was not selected for a special assignment; was relocated to a different office away from other attorneys; and was denied meaningful work commensurate with her grade and experience.  382 F.3d at 1071.  The Tenth Circuit found that the alleged actions, in the aggregate, did not amount to an adverse employment action, but instead were mere inconveniences or alterations of job responsibilities.  *Id.* at 1075.  I find that the conduct complained of here is not even as egregious as that described in *Stover.*

Plaintiffs also rely on *Bickerstaff*, a case from the Southern District of New York where an African-American female tenured professor brought Title VII retaliation and hostile work environment claims against a college. Bickerstaff's list of "adverse employment actions" in support of her retaliation claim included the following: (1) that the College took away her "academic leadership prerogatives" to which she was entitled under the bylaws by refusing to allow her to participate in decisions to hire her colleagues; (2) that the College had granted her minimal wage increases; and (3) that College administrators had excluded her from social functions.  354 F.Supp.2d at 279.  After holding that none of the individual acts complained of constituted adverse employment actions, the district court rejected plaintiff's contention that the actions together constituted an adverse employment action. The court found that the uncontroverted evidence refuted plaintiff's claim that she had been the target of a campaign to meaningfully diminish her job status.  *Id.* at 283.  Specifically, the evidence showed that Bickerstaff continued to be a tenured professor at the college, that she had received merit salary increases over the six-year period following her protected activity, that she had been granted paid leave for a full semester, and that she had been invited to dinners at the homes of the College

President and the Dean of Faculty. *Id.* The district court also rejected plaintiff's argument that the definition of "adverse employment action" should be modified for discrimination actions involving tenured professors because tenured professors are immune from many of the adverse employment actions that employees in other professions may face. *Id.* The district court found no legal authority for carving out an "academic employment" exception to the adverse employment action requirement in Title VII cases. *Id.*

I likewise decline to find that "adverse employment action" should be defined differently for plaintiffs and other employees in academia, absent any legal authority to support that proposition.

I find and conclude that each plaintiff has failed to demonstrate that a genuine issue of material fact exists on his or her prima facie case of disparate treatment on the basis of race/national origin. Accordingly, I grant defendants' motion for summary judgment on the plaintiffs' race/national origin discrimination claims under Title VII and 42 U.S.C. §1981, excluding plaintiffs' allegations of low merit pay increases which I address separately below.

2.    Discriminatory merit pay increases

Plaintiffs also complain that their 2003 and 2004 merit salary increases constitute adverse employment actions.

Defendants first argue that plaintiffs' disparate salary increase claim is untimely because plaintiffs filed their EEOC charges more then 300 days after they received notice of the salary increases.

A Title VII litigant must file an administrative claim within 300 days of the alleged discriminatory conduct. 42 U.S.C. § 2000e-5(e)(1).  The filing is a statutory prerequisite to suit; a claim is barred if it is not filed within the statutory time limit. *Davidson v. America Online, Inc.,* 337 F.3d 1179, 1183 (10th Cir. 2003)(internal citations omitted).

Plaintiffs received notice of their January 2003 merit salary increases in a December 20, 2002 letter.   (MSJ, Ex. 9; Somoza Deposition, at 82; Bornstein-Gomez Deposition, at 95, 137) Plaintiffs filed their EEOC charges on December 1, 2003, approximately 345 days later.[8] (MSJ, Defendants' Statement of Undisputed Facts, at ¶48[9])

Plaintiffs were notified of their January 2004 merit pay increases on December 19, 2003. (MSJ, Ex. 10; Somoza Deposition, 112; Bornstein-Gomez Deposition, at 147) Plaintiffs filed their EEOC charges on October 22, 2004, approximately 308 days later. (MSJ, Defendants' Statement of Undisputed Facts, at ¶48[10])

Plaintiffs asserted in their depositions that they did not know that their merit salary increases were discriminatory until they saw the salary increases of their Department colleagues, which were posted in January 2003 and January 2004, respectively.

---

[8]Although plaintiffs filed informal EEO complaints with D.U. in August 2003, there is no evidence that the EEOC received notice of the complaints before December 2003.  Notice to the employer does not constitute a "filing" with the EEOC under 42 U.S.C. §2000e-5(e).  *See N.A.A.C.P. Labor Committee of Front Royal, Va. v. Laborers' Int'l Union of North America*, 902 F.Supp. 688, 701-702 (W.D.Va. 1993), *aff'd on other grounds, Baltimore v. Laborers Int'l Union of North America*, 67 F.3d 293 (Table) (4th Cir. (Va.) 1995); *see, also, Otstott v. Verex Assurance, Inc.*, 481 F.Supp. 1269, 1271 (N.D.Tex. 1980) (holding that filing charges of discrimination with employer did not satisfy "filing" requirement of 42 U.S.C. §2000e-5(e) because purpose of statutory section is to trigger EEOC's investigatory and conciliatory procedures)

[9]Plaintiffs do not dispute defendants' representation about the EEOC filing date.

[10]Plaintiffs do not dispute defendants' representation about the EEOC filing date.

The Tenth Circuit has held that "it is knowledge of the adverse employment decision itself that triggers the running of the statute of limitations," not knowledge of the alleged discriminatory motivation for that decision.  *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 559 (10th Cir. 1994)(holding that statute of limitations began to run on plaintiffs' age discrimination claims at the time employees were demoted and transferred even though employees did not know the motivations for those actions at the time they occurred); *see, also, Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1234 (10th Cir. 1999)(citing *Hulsey*).

Plaintiffs do not address defendants' timeliness argument in their Response brief nor do they state any facts to show that they are entitled to equitable tolling.  *See Hulsey*, 43 F.3d at 557 ("It is well settled that equitable tolling . . . is appropriate only where the circumstances of the case rise to the level of active deception . . . where a plaintiff has been lulled into inaction by her past employer.")  Accordingly, I dismiss plaintiffs' Title VII claims of disparate treatment based on their 2003 and 2004 merit salary increases as time-barred.

There is no administrative exhaustion requirement under 42 U.S.C. §1981. Accordingly, I address the merits of plaintiffs' claims under that statute.

In the Tenth Circuit, a plaintiff may be able to show an adverse employment action for purposes of a prima facie case under §1981 if he or she receives a smaller salary increase than other similarly-situated employees outside the protected class.  *See Ambro v. Boeing Co.*, 232 F.3d 790, 798 (10th Cir. 2000)(discussing elements of Title VII wage discrimination claim); *Maldonado*, 433 F.3d at 1307 (applying elements of Title VII

27

disparate treatment claim and *McDonald-Douglas* burden-shifting framework to claims under §1981).

The evidence shows that plaintiff Somoza received the lowest percentage salary increase for the 2001-02 academic year (2.69%), while Bornstein-Gomez received the third lowest (2.71%), for tenure-line faculty members.  (Kvistad Affidavit, and attached Ex. 3-C) Associate professor Lug (German) received the second lowest merit increase (2.70%).

Dean Kvistad testified in his deposition that faculty salaries are based on faculty performance which is rated in three categories: teaching, scholarship, and service, with teaching and scholarship being the most important.  (Kvistad Deposition, at 127)  Kvistad rates faculty performance based on faculty member's individual reports, the Department chair's report, and the directors' reports.  (*Id.* at 123-24)  Kvistad considers the faculty member's performance for the specific year in review, as well as his or her overall performance for the preceding four to five years.  (*Id.* at 124)  According to Dean Kvistad, plaintiff Somoza's "failure to publish in the years prior to his salary determinations was a key factor precluding him from receiving the highest merit increase." (Kvistad Affidavit, at ¶11)

I find that plaintiffs have failed to make a prima facie showing that they were similarly situated to other tenure-line non Hispanic faculty in the Department who received higher merit salary increases in January 2003.  The record shows that the operative time period for assessing faculty performance was the 2001-2002 academic year and the preceding four to five years, as evidenced by Kvistad's deposition testimony and the

December 20, 2002 letters to plaintiffs advising them that "the annual faculty salary review for academic year 2001-2002 is now complete" (MSJ Ex. 9).

Plaintiffs, associate professor Lug, and associate professor Watt did not have any publications for the 2001-02 year.  (Kvistad Affidavit, at 3-E)  Four of the other ten non Hispanic tenure-line professors who received higher merit salary increases than the plaintiffs had at least one publication during 2001-02, and one or more publications in the preceding three academic years.[11]   (Kvistad Affidavit, at Ex. 3-E) In contrast, plaintiff Somoza did not publish between the 1998-99 academic year and the 2001-02 academic year.  During that same time frame, plaintiff Bornstein-Gomez had one publication (during the 1998-99 academic year). Lug, whose salary increase was between the amounts received by Somoza and Bornstein-Gomez, published twice during the 1998-99 academic year. Watt, who received a significantly higher increase than plaintiffs,  published six times between 1998 and 2000, even though she had no publications during academic year 2001-02.  (*Id.*)

The court's record lacks the publishing history of all the tenure-line faculty in the Department to show whether they are similarly situated to the plaintiffs.  However, plaintiffs bear the burden on summary judgment to point to evidence to establish that at least one non Hispanic tenure line faculty member in the Department who received a higher merit pay increase than the plaintiffs did not publish or published only once between the 1998-99 academic year and the 2001-02 academic year.  Plaintiffs have not met their burden

---

[11]The court's record does not contain the publishing history of the other four tenure-line faculty in the Department.

and have thus failed to establish the existence of a material factual dispute about whether their low merit pay increases in January 2003 were adverse employment actions. Plaintiffs' subjective opinions that their job performance should have been ranked higher by Dean Kvistad (Somoza Deposition, at 91; Bornstein-Gomez Deposition, at 144) does not raise a material factual dispute about whether they were similarly situated to their tenure-line colleagues. *See Aero*, 232 F.3d at 798.

For the 2002-03 academic year, plaintiff Somoza received a 2.55% merit increase plus a $750 bonus. (Kvistad Affidavit, at ¶10, and attached Ex. 3-D; MSJ Ex. 10) Plaintiff Bornstein-Gomez received a 2.55% increase plus a $750 bonus. (*Id.* at ¶13, and attached Ex. 3-D) Plaintiffs and associate professor Watt were the only Department faculty who received a bonus in 2004. (Kvistad Affidavit, at ¶10) Only four tenure-line faculty received a higher merit salary increase than the plaintiffs – DiFranco, Torre, Watt and O'Neil; however, with the exception of assistant professor O'Neil's increase of 4.92%, each of the other faculty member's increases are not larger than each plaintiff's $750 bonus. (Kvistad Affidavit, Ex. 3-D) Accordingly, the only tenure-line faculty member in the Department who received an overall larger salary increase than did the plaintiffs in January 2004 was assistant professor O'Neil.  Plaintiffs have not submitted any evidence to show that they were similarly situated to O'Neil.  Indeed, the record shows that O'Neil taught more credit hours than either plaintiff during the 2002-03 academic year. (Kvistad Affidavit, Ex. 3-A)

Accordingly, I grant defendants' motion for summary judgment on plaintiffs' 42 U.S.C. §1981 disparate treatment claim based on plaintiffs' 2003 and 2004 merit salary

increases because plaintiffs have failed to establish a material factual dispute about whether they were subjected to adverse employment actions.

B.      Retaliation

It is unlawful under Title VII and 42 U.S.C. §1981 for an employer to retaliate against an employee because the employee has complained about unlawful discrimination. 42 U.S.C. § 2000e-3(a); *AGNAIL v. Ferguson Const. Co.*, 237 F.3d 1248, 1258 (10th Cir. 2001)(stating that a plaintiff must establish the same prima facie elements to recover for unlawful retaliation under Title VII and §1981)

An employee may prove unlawful retaliation with direct evidence or by establishing a prima facie case under the *McDonnell Douglas* framework.   *Id.*   A prima facie case of retaliation has three elements: (1) the plaintiff engaged in protected opposition or participated in a Title VII proceeding; (2) adverse employment action subsequent to the protected activity[12]; and (3) a causal connection between the protected activity and the adverse employment action.   *Medina*, 413 F.3d at 1135-36.   In addition, the employee must show that the individual who took the adverse action against him knew about the employee's protected activity.   *Peterson v. Utah Dep't of Corrections*, 301 F.3d 1182, 1188-89 (10th Cir. 2002)(citing Tenth Circuit cases).

---

[12]I note that the Supreme Court has granted certiorari review to determine whether an employer may be held liable for unlawful retaliation under Title VII for: any "`materially adverse change in the terms of employment' (including a temporary suspension rescinded by the employer with full back pay or an inconvenient reassignment, as the court below held); for any adverse treatment that was `reasonably likely to deter' the plaintiff from engaging in protected activity (as the Ninth Circuit holds); or only for an `ultimate employment decision' (as two other courts of appeals hold)."   *See Burlington Northern Santa Fe Railway Co. v. White*, 126 S.Ct. 797 (Dec. 5, 2005).

Informal complaints to superiors about perceived unlawful discrimination constitute protected activity. *See Her v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004). Plaintiffs have presented evidence that they complained about racial discrimination and a hostile work environment to Chair Beaudin and to Dean Kvistad as early as March 2003, and no later than May 2003.[13]   Accordingly, I consider whether plaintiffs have proffered evidence that the employer subsequently took "adverse employment actions" against plaintiffs that were causally connected to the plaintiffs' protected activity.

I find and conclude that plaintiffs have not produced any evidence to meet their burden of demonstrating that the employer retaliated against them with adverse employment actions because they rely on the same events they offered in an attempt to support their disparate treatment claims which I found did not rise to the level of adverse employment actions. Plaintiffs therefore have not created any material factual issues on the elements of a prima face case of retaliation.

Plaintiffs argue, however, that Department Chair Pap has subjected plaintiffs to the following retaliatory acts since they filed the instant lawsuit: (1) the Spanish section does

---

[13]Plaintiff Somoza contacted the D.U. EEO Director on February 12, 2003 to inquire about possible reverse sex discrimination in the hiring of a tenure-line professor.  (Somoza Deposition, at 172-76; Plaintiffs' Ex. 12 ) However, Somoza did not present the issue as a complaint. There is no evidence that the EEO Director told anyone else about her conversation with plaintiff Somoza.

Plaintiffs met with a Board of Trustees member in February or March 2003 to discuss race discrimination and what plaintiffs perceived to be a hostile work environment.  (Somoza Deposition, at 203-04) There is no evidence in the record that either Chair Beaudin or Dean Kvistad was aware of that meeting.

Plaintiffs complained to Beaudin about discrimination associated with their 2003 merit salary increases on March 17, 2003.  (Somoza Deposition, 190-91; Plaintiffs' Exs, 16, 17) On May 11, 2003, plaintiffs wrote a letter to Beaudin complaining about a racially hostile work environment.  (Plaintiffs' Ex. 23)  Plaintiffs met with Dean Kvistad and the D.U. EEO Director on May 19, 2003 to discuss disparate treatment and a racially hostile work environment. (Somoza Deposition, at 195; Plaintiffs' Ex. 24)

not get the resources or personnel that the other sections do, even though it is the largest section in the Department; (2) the Spanish section is required to cancel classes if the enrollment is seven to nine students while other programs which have only two students are allowed to continue; (3) Chair Pap's attitude is accusatory and threatening in demanding teaching outside of the Spanish program; and (4) Chair Pap's emails to Spanish section faculty are dictatorial. (DiFranco Affidavit, at ¶18; Affidavit of Wendy Mendez, at ¶21)  It is not clear whether plaintiffs rely on the above cited conduct to support their retaliation claim, or whether the alleged actions support their racially hostile work environment claim only.  I find that if plaintiffs claim that the actions support their retaliation claim, the court lacks subject matter jurisdiction because plaintiffs have not exhausted their administrative remedies.

An employee must present his discrimination claim to the EEOC before bringing suit in federal court.  42 U.S.C. §2000e-5; *MacKenzie*, 414 F.3d at 1274 (recognizing that, in the Tenth Circuit, administrative exhaustion is jurisdictional prerequisite for discrimination claims).[14]  A Title VII plaintiff is required to exhaust administrative remedies for each discrete incident of discriminatory or unlawful treatment before seeking judicial relief.  *See Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003)(citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110-113 (2002)(holding that "discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges").

---

[14]The court may raise the issue of subject matter jurisdiction sua sponte at any time during the course of the proceedings. See *McAlester v. United Airlines, Inc.,* 851 F.2d 1249, 1252 (10th Cir.1988).

Plaintiffs filed their last EEOC charge on October 22, 2004.  Plaintiffs have not produced evidence that they filed any additional administrative charges after they filed their Title VII suit, or that they have received another right to sue notice from the EEOC. Accordingly, I grant defendants' motion for summary judgment on plaintiffs' Title VII retaliation claims.

C.    Racially Hostile Work Environment

Discriminatory conduct "that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" is unlawful under Title VII.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  A racially hostile work environment is also actionable under 42 U.S.C. §1981.  *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369, 372-73 (2004).

To survive summary judgment on their racially hostile work environment claim, plaintiffs must proffer evidence "`that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment and (2) the harassment was racial or stemmed from racial animus.'" *Chavez v. New Mexico*, 397 F.3d 826, 831-32 (10th Cir. 2005)(quoting *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir.1994)).  Plaintiffs must point to more than a "a few isolated incidents of racial enmity" or "sporadic racial slurs" to establish pervasive harassment. *Id*; *see, also, Witt v. Roadway Express*, 136 F.3d 1424, 1432-33 (10th Cir.1998).

I consider the following circumstances to determine whether plaintiffs' work environment was "hostile" or "abusive": the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance;

34

and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23. The conduct must be severe or pervasive enough so that a reasonable person would find the work environment to be hostile or abusive, and the victim must subjectively perceive his or her environment to be abusive. *Id.* at 21-22.

Some of the conduct plaintiffs cite in support of their racially hostile work environment claim occurred more than 300 days before plaintiffs filed their EEOC charges. Plaintiffs also complain about actions taken by Chair Pap which occurred after plaintiffs filed their EEOC charges. Generally, a Title VII plaintiff must exhaust administrative remedies by filing a charge of discrimination with the EEOC for each discriminatory act, which is the subject of his or her Title VII suit, within 300 days of the date the discriminatory act occurred. 42 U.S.C. §2000e-5(e). In *Morgan*, 536 U.S. at 120, the Supreme Court held that pre and post EEOC filing incidents that involved the same types of employment actions and that were perpetrated by the same individuals are actionable as part of a plaintiff's hostile work environment claim. *See, also, Duncan*, 397 F.3d at 1309-10 (citing *Morgan*). Thus, conduct that occurred outside the 300 day limitations period may be actionable as long as it is sufficiently related to at least one objectionable act that occurred within the limitations period.[15]

Here, I find that the objectionable acts plaintiffs describe, which began in 1999 and continued through the 2004-05 academic year, are related. I thus consider the facts

_____

[15]The Supreme Court recognized that hostile work environment claims are different from disparate treatment and retaliation claims because liability for a hostile work environment "[is] based on the cumulative effect of individual acts," *Morgan*, 536 U.S. at 115, and depends upon proof of repetitive conduct extending over a period of time. *Id.* at 120 n.12.

alleged both before the 300 day period and afterwards in analyzing the sufficiency of plaintiffs' evidence of a racially hostile work environment.[16]

Plaintiffs point to the following as evidence to show that alleged harassment by the Department Chair and plaintiffs' colleagues was because of racial animus: (1) Helga Watt's statement to visiting professor Carole Byrd in 1999 that: "I don't like Spanish people.  They have too much power and I am going to do something about it"  (Byrd Affidavit, at ¶17); (2) Helga Watt's statement in January 2003 during a Department meeting that "Goethe [and other German writers] were known all over the world and more renowned better" [sic] than Spanish writers (quoted in Plaintiffs' Response, at 9[17]); (3) Helga Watt's frequent comments to Byrd that plaintiffs' abilities were "inferior" in some manner (Byrd Affidavit, at ¶15); (4) Catherine O'Neil's statement to Carole Byrd in the Fall of 2002 that "some people were created more equal than others" during a discussion when plaintiffs were explaining that they do not celebrate Columbus Day because of Columbus' treatment of native Americans (Byrd Affidavit, at ¶20); (5) Sieglinde Lug's statement to Byrd that "Miriam [Bornstein-Gomez] is incapable of understanding [as I am because I am European] what is wrong with nationalism" during a conversation about displaying flags  (Byrd Affidavit, at ¶20); (6) Susan Walter's statement in the Fall of 2002 that "everything written in English is better than anything written in Spanish"  (Byrd Affidavit, at ¶20); (7) Javier Torre's statement at a dinner party at Professor Lug's house – when a Mexican scholar was the honored guest – that "nothing is going on in Mexico that hasn't already happened

---

[16]I note, however, that many of the acts described are not relevant because they were directed at the Spanish section as a whole, as discussed in the text, *infra.*

[17]Plaintiffs do not provide a record citation for this remark.

in Europe; your circumstances are not unique or special in any way" (Byrd Affidavit, at

¶20[18]); and, (8) Norman Watt's[19] question to a psychology graduate student in the Summer

of 2004, in Somoza's presence, about whether the student had "made sure that Oscar

[Somoza] ha[d] his green card." (Somoza Deposition, at 122-25).

Plaintiffs also rely, once again, on the objectionable conduct cited in support of their

disparate treatment and retaliation claims to show that they have been subjected to a

racially hostile work environment.   However, I limit my consideration to only that conduct

directed at the plaintiffs as individuals, as contrasted with conduct directed to all of the

faculty in the Spanish section, some of whom are non Hispanics.

I consider the following alleged conduct directed specifically at the plaintiffs: In

2002, Dean Kvistad reprimanded plaintiffs and their non Hispanic colleague, Ralph

DiFranco, for voting not to grant tenure to Frances Mecartty; plaintiffs' colleagues were

rude and disrespectful to plaintiff Somoza during a Department meeting in 2003 to discuss

Susan Walter's candidacy for an assistant professorship in the Spanish section and

ridiculed Somoza after forcing him to justify his decision to postpone the search for a

candidate; Chair Beaudin appointed a basic language coordinator for the Spanish section

for 2004-05 without consulting plaintiff Bornstein-Gomez; Chair Pap selected the Spanish

section coordinator  for 2004-05 without consulting Bornstein-Gomez; Chair Pap deleted

---

[18]Byrd does not state when Torre made the comment.  However, the record shows that Torre was hired in 2001.  (Bornstein-Gomez Deposition, at 212) Byrd was a visiting professor from the Fall of 1999 to the Spring of 2001 (Byrd Affidavit, at ¶3), so Torre presumably made the comment during the Spring of 2001.

[19]Norman Watt was a professor in the psychology department at D.U. and was divorced from Helga Watt at the time he made the comment. (Somoza Deposition, at 123-24)

plaintiff Bornstein-Gomez' name from the cultural and critical studies program; Professor Lug did not invite plaintiffs to a dinner at Lug's home when a Mexican scholar was the honored guest; Professor Lug did not invite plaintiff Bornstein-Gomez to women's studies dinners; the plaintiffs received low merit pay increases for 2003 and 2004; and, defendant Torre, plaintiffs' colleague in the Spanish section, has subjected the plaintiffs to constant criticism and interferes with their ability to conduct business in the Spanish section.

In addition, plaintiffs point to evidence that Chair Beaudin and plaintiffs' colleagues on the hiring committee subjected Wendy Mendez, a Hispanic lecturer in the Spanish section, to a more onerous and unfair hiring process than other faculty members.  (*See, generally,* Bornstein-Gomez Deposition, at 201-11; Plaintiff's Response, Ex. 20; Mendez Affidavit, ¶¶2-10)

Plaintiffs have submitted evidence to show that they subjectively believe that their employer's and co-workers' conduct was so severe that it created a hostile work environment.  (Somoza Deposition, at 71, 134-141, 184-85, 211; Bornstein-Gomez Deposition, at 74, 242-49) Accordingly, I must determine whether the conduct and comments plaintiffs describe were  objectively severe and pervasive enough to alter the conditions of the plaintiffs' employment.  *See Harris*, 510 U.S. at 21-22.

The Tenth Circuit has held, in the context of sexually hostile work environment claims, that evidence of a substantial amount of gender-neutral harassment together with a smaller amount of gender-based conduct can support a finding of gender animus sufficient to sustain a hostile work environment claim.  *See Chavez,* 397 F.3d at 833-37 (holding that  plaintiff's evidence of several instances of gender-based and physically

threatening, gender-neutral harassment, which occurred within a one-year period, created a material factual issue about whether plaintiffs were subjected to a sexually hostile work environment); *see, also, O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098-99 (10th Cir. 1999)(plaintiff's evidence that male co-worker made repeated derogatory remarks about women; told other co-workers that plaintiff and other women were incompetent, overly emotional and hysterical; described sexual dreams to his co-workers and discussed his interest in Playboy magazine; told co-workers that plaintiff was going to file a sexual harassment lawsuit against him; and that a co-worker's conduct caused other employees to ostracize her and to otherwise impede her efforts to perform her work over five-month period was sufficient to survive defendant's summary judgment motion on plaintiff's sexually hostile work environment claim).

In *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257 (10th Cir. 1998), however, the Tenth Circuit concluded that the two plaintiffs' evidence of gender and gender-neutral incidents was inadequate to sustain a sexually hostile work environment claim. There, one plaintiff had been subjected to one gender-based comment, four acts of unwanted physical contact, and periodic touching from her supervisor; the other plaintiff had been subjected to four gender-based comments from the same supervisor. *Id.* at 1261. The supervisor also commented to the plaintiffs that the mall roof looked like a woman's breasts and he took the plaintiffs to a Hooters restaurant while on business travel. *Id.* at 1262-63. After considering the gender-based and gender-neutral conduct together, the Tenth Circuit concluded that although the evidence established that the plaintiffs worked in an unpleasant environment, "the gender-based incidents were too few and far between

to be considered `sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive working environment.'" *Id.* at 1263 (citations and internal quotation marks omitted). The *Penry* court found that the gender-based incidents were spread over more than three years and were thus insufficient to establish a sexually hostile work environment. *Id.* The court concluded that the "vast majority" of the supervisor's behavior appeared to be motivated by "poor taste and a lack of professionalism" rather than by the plaintiffs' gender. *Id.*

Here, I find that plaintiffs' evidence of an alleged racially hostile work environment is more similar to *Penry* than it is to *Chavez* or *O'Shea.*

I first consider the alleged race-based comments. I find that the comment Professor Norman Watt made in the psychology department at D.U., although deplorable, could not have affected the terms or conditions of plaintiff Somoza's work environment because Norman Watt is not a professor in the Department of Languages and Literature where the plaintiffs work, there is no evidence that Watt has any influence over the terms and conditions of the plaintiffs' employment, and the student spoken to was a graduate student in psychology, not a student in the Spanish section.

The 1999 Helga Watt comment  – that she doesn't like Spanish people because they have too much power – may be probative of racial enmity, but it does not carry as much weight when considered in the totality of the circumstances here. First, Carole Byrd originally told the D.U. administration in an April 2003 written complaint that Helga Watt had stated: "I don't like people in Spanish. They have too much power. And I am going to do something about it." (Plaintiffs' Response, Ex. 19, Carole Byrd's April 8, 2003 complaint

to D.U., at 6)  Byrd later stated, in her March 2006 affidavit in support of plaintiffs' summary judgment response, that she had been mistaken in the earlier document about her quote of Watt's comment and she changed her account to: "Helga Watt stated: 'I don't like Spanish people. They have too much power and I'm going to do something about it.'" Second, the record  shows that Watt wrote to the Tenure and Promotion Committee in January 2000, after she made the alleged racist comment (Reply Brief, Ex. 32), and that she recommended Professor Somoza for promotion to full professor because of Somoza's "demonstrated excellence in scholarship in teaching, as well as his contributions to the department, university and community" based on Watt's "personal knowledge as a long-time colleague and on [her] more recent experience with [Somoza] as his department chair." (*Id.*)  Watt also wrote to the D.U. Honors Subcommittee of the Faculty Senate Personnel Committee in February of 2000 recommending plaintiff Somoza for the United Methodist Church – University Scholar/Teacher of the Year Award, stating that plaintiff had been an "outstanding" teacher since he joined the D.U. faculty in 1979.  (Reply Brief, Ex. 33) I find that Watt's alleged racist comment was neutralized by her later recommendations on Somoza's behalf.

The comments Watt, O'Neil, Lug, and Walter made are ambiguous and cannot support a finding of racial enmity.  Watt and Walter's statements praising English writers and writings over their Spanish counterparts are directed at all Spanish speakers and not to Mexicans or Mexican-Americans.  Professor O'Neil's comment to Byrd that "some people are created more equal than others" in the context of plaintiffs' statements about Columbus Day celebrations and professor Lug's statement to Byrd that plaintiff Bornstein-

41

Gomez was incapable of understanding what is wrong with nationalism (as was she because Lug is European) were not directed to any particular race or nationality and thus are not evidence of a bias against Hispanics. Watt's comment that plaintiffs' abilities were "inferior" in some manner is too vague to be considered discriminatory toward Hispanics. Because "mere utterance of an . . . epithet which engenders offensive feelings in an employee, does not sufficiently affect the conditions of employment to implicate Title VII," *Harris*, 510 U.S. 17, 21 (1993)(quotation and citation omitted), none of the above comments are probative of a racially hostile work environment.

Torre's statement to a Mexican scholar at associate professor Lug's dinner party that "nothing is going on in Mexico that hasn't already happened in Europe; your circumstances are not unique or special in any way" could be construed as evidence of race/national origin animus; however, the comment was not made in the plaintiffs' presence, which tempers its severity. *See Witt,* 136 F.3d at 1433 (recognizing that racial comments not directed at the plaintiff "indicates a lower degree of animosity and severity"). Moreover, there is no evidence that plaintiffs knew about Torre's comment before filing their lawsuit.  To support their hostile work environment claim, plaintiffs may rely only on conduct of which they were aware. *See Hirase-Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 782 (10th Cir. 1995)(citing *Harris*).

To summarize, plaintiffs' best evidence of racial enmity consists of the two isolated racial comments Helga Watt and Torre made which were approximately two years apart and which were made outside the plaintiffs' presence. As discussed previously, Carole Byrd equivocated somewhat about the comment attributed to Watt and the impact of the

comment was later neutralized by Watt's actions in recommending Somoza for a full professorship and a teaching award. In addition, plaintiffs have not demonstrated that they knew of Torre's comment before this lawsuit was filed in February 2005.

Under *O'Shea*, *Chavez*, and *Penry*, I also consider whether any of the facially neutral conduct of which plaintiffs complain can support a finding of racial animus sufficient to sustain plaintiffs' hostile work environment claim. I find that plaintiffs have failed to proffer any evidence from which a reasonable fact-finder could infer that Dean Kvistad, Chair Beaudin, Chair Pap, or any of the other Department faculty members, except Watt and Torre, were motivated by racial/national origin bias in the complained of conduct. *See Chavez*, 397 F.3d at 838 (holding that a reasonable jury could infer that employee who committed gender-based harassment was motivated by gender in other facially neutral conduct, but fact-finder could not impute that employee's improper motive to the facially-neutral conduct of other employees).

Plaintiffs point to the affidavits provided by professor DiFranco, plaintiffs' Italian colleague in the Spanish section, and former visiting professor Carole Byrd (Fall of 1999 through Spring of 2001) as evidence of their co-workers' racial animus. In their affidavits, DiFranco and Byrd opine that Department faculty Helga Watt, Sieglinde Lug, Chair Beaudin, Frederique Chevillot, Catherine O'Neil, Susan Stakel and Javier Torre engaged in a campaign to deprive plaintiffs of their influence, control and decision-making ability in the Spanish section because those professors viewed people of European origin as superior culturally, intellectually and linguistically to Mexicans or Latin Americans, and that those faculty members were of the opinion that they, rather than the plaintiffs, should

control the decisions in the Spanish section.  (DiFranco Affidavit, at ¶9; Byrd Affidavit, at ¶4)  However, a plaintiff's co-worker's subjective beliefs that a plaintiff was subjected to a racially hostile work environment is not sufficient to overcome defendants' motion for summary judgment. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1408 n. 7 (10th Cir.1997)(citations omitted).

Moreover, while evidence that others in the workplace were subject to racial harassment may be relevant to whether the harassment the plaintiffs suffered was sufficiently severe and pervasive to be a racially hostile environment, *see Nieto v. Kapoor* 268 F.3d 1208, 1219 n.7 (10th Cir. 2001)(citing cases), plaintiffs' evidence about Chair Beaudin and their colleagues' treatment of Wendy Mendez does nothing to strengthen plaintiffs' hostile work environment claim.  Chair Beaudin and some of the other faculty members in the Department may have made Mendez' hiring process difficult, but they ultimately voted to hire her, and Mendez is now a permanent lecturer in the Spanish section.  (Bornstein-Gomez Deposition, at 204-07; Mendez Affidavit, ¶9)

Accordingly, I consider only Helga Watt and Javier Torre's alleged conduct[20] for my analysis of the severity and pervasiveness of the alleged harassment.

Plaintiffs complain that Watt participated in a 2003 Department meeting in which she, along with other Departmental colleagues, was disrespectful and rude to plaintiff Somoza in forcing him to justify his decision not to recommend Walter for an assistant professorship.  Plaintiffs do not allege that Watt made any racist comments during that

---

[20]I note that Watt and Torre are the plaintiffs' co-workers. I do not reach the issue of whether D.U. can be held liable for a racially hostile work environment based on co-workers' racial harassment.

meeting, or that Watt's comments during the meeting somehow affected the terms and conditions of plaintiffs' employment; Somoza stated only that he felt humiliated.

Plaintiffs claim that Torre treats both plaintiffs with disrespect, does not consult with them about section business, and generally interferes with Spanish section business. Plaintiffs consider Torre's behavior as continuing harassment.  Plaintiff Somoza testified in his deposition that Torre: "sent emails that were very strong in nature"; urged Chair Beaudin to convert a permanent lecturer position filled by Wendy Mendez to a temporary position; nominated himself as the section faculty member to sit on a Departmental search committee; does not speak to Somoza at all; "does not consult with the [Spanish] section when he wants to do things related to the section;" and, that Torre communicated with the Department Chair directly (instead of with the Spanish section) concerning Torre's proposal for a study abroad program. (Somoza Deposition, at 262-69)  Bornstein-Gomez also testified about Torre's harassment in her deposition. She stated that Torre: has prevented the Spanish section from holding meetings; refuses to speak to her; refuses to work collaboratively with the other Section faculty members; has written letters and e-mails criticizing her; and, that Torre makes decisions that are disrespectful to his Section colleagues. (Bornstein-Gomez Deposition, at 173-174, 214-15)   Professor DiFranco describes Torre's behavior towards the plaintiffs as "hostile" and "rude" and states, as an example of Torre's harassing conduct, that Torre wrote an email questioning plaintiffs' professional evaluation and opinion of Wendy Gomez and her qualifications for the lecturer position in April of 2003.  (DiFranco Affidavit, at ¶17)

The evidence shows that, notwithstanding the allegedly racist comment at least two years before, plaintiffs and Torre had a good working relationship until after plaintiffs declined to recommend Torre's wife, Susan Walter, for an open assistant professorship position in February of 2003. (Bornstein-Gomez Deposition, at 175; Plaintiffs' Response, Ex. 21) According to Bornstein-Gomez, Torre's interference in Spanish section business, his disrespect, and his criticism increased after plaintiffs accused him of ethical improprieties in a hiring process involving Wendy Mendez and an outside candidate who was Torre's friend.  (Bornstein-Gomez Deposition, at 219-221)

I find that while there is some evidence that Torre made an arguably racist remark at a dinner party outside of plaintiffs' presence at some time during the Spring of 2001, the evidence demonstrates that Torre's "harassment" of plaintiffs was a direct result of plaintiffs' decision to reject Torre's wife's candidacy for an open assistant professorship position in 2003.  Torre did not make any further comments suggestive of racial animus. Title VII does not recognize an uncomfortable working situation, or even a hostile one, which does not have evidence of racial animus.  *See Aramburu*, 112 F.3d at 1406; *Chavez*, 397 F.3d at 833.

Finally, I find that even if a reasonable juror could infer that Torre's conduct was racially-motivated, that conduct, together with Torre's single racist remark and Watt's isolated remark and her conduct at one meeting in 2003, were not severe or pervasive enough to establish the existence of a material factual dispute about whether plaintiffs were subjected to a hostile work environment that affected the terms and conditions of their employment as professors at D.U.  The evidence as a whole shows that some of plaintiffs'

46

colleagues who are of European descent made plaintiffs' work environment difficult and unpleasant, and acted in a rude and unprofessional manner toward plaintiffs.  However, a reasonable fact-finder could not infer that the comments and conduct described, which occurred over a five year period, were objectively sufficiently hostile or abusive within the meaning of *Harris.  See Penry*, 155 F.3d at 1263.  Accordingly, I dismiss plaintiffs' Title VII and §1981 racially hostile work environment claims.

D.      Liability of Individual Defendants

Defendants argue that the individual defendants must be dismissed because they cannot be held liable under Title VII.

Although personal capacity suits against individual supervisors or co-workers are inappropriate under Title VII, see *Maldonado*, 433 F.3d at 1316, an individual defendant can be held liable under §1981 if the individual defendant was personally involved in the discriminatory conduct. *See Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 983 (10th Cir.1991), *overruled on other grounds by Kendrick*, 220 F.3d at 1228; *Ramirez v. Dep't of Corrections*, 222 F.3d 1238, 1240-42, 1244 (10th Cir. 2000).

Because I have dismissed plaintiffs' Title VII and §1981 claims, plaintiffs' individual capacity claims against defendants Helga Watt, Luc Beaudin, and Javier Torre under 42 U.S.C. §1981 are also dismissed.

E.      State Law Claims

1.      Colorado Anti Discrimination Act

Plaintiffs claim that defendants' discriminatory conduct and harassment violated the Colorado Anti Discrimination Act ("Act"), C.R.S. §24-34-402(1).

The Act makes it a discriminatory or unfair labor practice for an employer "to refuse to hire, to discharge, to promote or demote, to harass during the course of employment, or to discriminate in matters of compensation against any person otherwise qualified because of disability, race, creed, color, sex, age, national origin, or ancestry." §24-34-402(1)(a); *see*, *also*, *Brooke v. Rest. Servs.*, 906 P.2d 66, 69 (Colo.1995)(noting that the Act is intended to eradicate employers' discriminatory practices). The Act also prohibits both employers and employees from aiding, abetting, or attempting to commit such discriminatory or unfair labor practices. § 24-34- 402(1)(e)(I) and (III).

Claims under the Act are analyzed under Title VII precedent. *See Colorado Civil Rights Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997). Plaintiffs' state statutory claims are based on the same conduct that they proffer to support their claims under Title VII and §1981. Because I have dismissed plaintiffs' federal statutory claims, I also dismiss plaintiffs' claims under the Colorado Anti Discrimination Act.

2.    Negligent Supervision and Retention

Plaintiffs claim that D.U. provost Coombe failed to supervise Dean Kvistad properly, that Kvistad failed to supervise Chair Beaudin properly and that Chair Beaudin failed to supervise defendant Torre, Helga Watt and plaintiffs' other colleagues in the Department properly, and that collectively, Coombe, Kvistad, and Beaudin "failed to take any steps to prevent foreseeable harm to the plaintiffs caused by the discrimination, harassment and hostile work environment." (Response Brief, at 32)

"An employer may . . . be subject to liability for negligent supervision if he knows or should have known that an employee's conduct would subject third parties to an

unreasonable risk of harm." *Moses v. Diocese of Colo.*, 863 P.2d 310, 329 (Colo.1993) (internal quotations and citation omitted).

Defendants argue that plaintiffs' negligent supervision and retention claim is barred by the Colorado Worker's Compensation Act ("CWCA"), C.R.S. §8-40-101, *et seq.*  The CWCA applies "[w]here the injury or death is proximately caused by an injury or occupational disease arising out of and in the course of the employee's employment and is not intentionally self-inflicted." C.R.S.  §8-41-301(1)(c).  Defendants contend, in the alternative, that plaintiffs' claim fails because plaintiffs cannot show that they were subjected to unlawful discrimination, harassment or retaliation.

Plaintiffs respond that their claim is not barred by the CWCA because it is premised on intentional misconduct targeted specifically at the plaintiffs.

I need not resolve whether plaintiffs' negligent supervision claim is barred by the CWCA because even if it is not barred, it fails on another ground.  An essential element of plaintiffs' claim is that plaintiffs were subjected to an unreasonable risk of harm.  The evidence plaintiffs rely on to prove that element is the same evidence that they claim supported their Title VII and §1981 claims.  Because I have dismissed plaintiffs' federal statutory claims, I must also dismiss the negligent supervision claim. *See Pascouau v. Martin Marietta Corp.*, 185 F.3d 874 (Table) (10th Cir. (Colo.) 1999)[21](affirming summary judgment on plaintiff's negligent supervision claim because element of her claim – that she was subjected to an unreasonable risk of harm – was dependent on proof of the same conduct and injury forming basis for her Title VII claim, which was dismissed).

-------

[21]A copy of *Pascouau* is attached to the Memorandum Opinion and Order.

49

3.     Breach of Contract

Plaintiffs finally claim that their employment contracts with D.U. incorporate D.U.'s Faculty Personnel Guidelines and the Department's Bylaws and that defendants have violated the provisions of those documents in numerous ways. *See* Response Brief, at 41-47.   Defendants argue that even if plaintiffs can establish that an agreement was breached, plaintiffs have not pointed to any evidence to show that they suffered any damages as a result.

In *Continental Air Lines, Inc. v. Keenan*, 731 P .2d 708, 711-12 (Colo.1987), the Colorado Supreme Court identified two legal theories under which an at-will employee may enforce promises made by an employer in an employee handbook or manual:  (1) under ordinary contract principles  – that is, where "in promulgating the [policies or] procedures the employer ... manifested his willingness to enter into a bargain in such a way as to justify the employee in understanding that his assent ... would conclude the bargain and ... his initial or continued employment constituted acceptance of an consideration for those [polices or] procedures," *id.* at 711; and, alternatively, (2) under a theory of promissory estoppel, if the employee "can demonstrate that the employer should reasonably have expected the employee to consider the employee manual as a commitment from the employer to follow the [polices or] procedures, that the employee reasonably relied on the [polices or] procedures to his detriment, and that injustice can be avoided only be enforcement of the [policies or] procedures." *Id.* at 712.[22]

---

[22]Plaintiffs have not specifically pleaded a claim of promissory estoppel.

The employer statement must be "sufficiently definite to enable the court to determine whether the contract has been performed." *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir. 1994)(internal citation omitted) (applying Colorado law).

Plaintiffs premise their breach of contract claim, in part, on the sections of the Faculty Personnel Guidelines concerning professional behavior and responsibility and equal opportunity employment. (Plaintiffs' Ex. 35, §§1.1, 1.2).  However, courts applying Colorado law have held that general statements in an employer handbook about fair and non discriminatory treatment and respect for others are too indefinite or vague to be the basis of a breach of contract claim.  *See, e.g., Vasey,* 29 F.3d at 1465; *see, also, Fejes v. Gilpin Ventures, Inc.*, 960 F.Supp. 1487, 1496 (D.Colo. 1997) (Babcock, J.); *Marsh v. Delta Air Lines, Inc.,* 952 F.Supp. 1458, 1466 (D.Colo. 1997)(Daniel, J.).

Plaintiffs next assert that defendant Dean Kvistad violated the following provision of the Faculty Personnel Guidelines, causing plaintiffs to receive a smaller merit salary increase in 2003:

> Section 2, Faculty Positions
> . . .
>
> The Department and the University bear a responsibility to the faculty member if there are changes in professional expectations to counsel and assist him/her over a transition period before the change in position expectations affect his/her eligibility for reappointment, promotion tenure and salary increases.

(Plaintiffs' Ex. 35)

Plaintiffs argue that after they were notified of their 2003 merit salary increases and learned about the other Department faculty members' increases, they met with Dean

Kvistad in March 2003 and learned that Kvistad had "raise[d] the bar" with regard to the research requirement.  Plaintiffs assert that Kvistad admitted he did not specifically notify plaintiffs that additional emphasis would be placed on "research" for purposes of faculty members' 2003 merit salary increases. (*See* Kvistad Deposition, at 127)  Plaintiffs claim that under Section 2 of the Faculty Personnel Guidelines, Kvistad was required to notify them in a timely manner that scholarship would be credited more heavily than teaching for the 2003 merit salary increase.  Plaintiffs claim that they have suffered economic losses as a result of defendants' breach because they should have received larger merit salary increases.

Whether an employer statement or policy is sufficiently definite to constitute an enforceable implied contract is generally a factual inquiry for the jury unless the employer statement is nothing more than a vague assurance.  *Dupree v. United Parcel Service,* 956 F.2d 219, 222-23 (10th Cir. 1992).   Assuming that the provisions in the Faculty Personnel Guidelines at issue are sufficiently definite to constitute D.U.'s enforceable implied contact, plaintiffs must point to evidence that the provision was breached.

According to Dean Kvistad,  teaching is emphasized in some years for purposes of the faculty performance review process, and scholarship is emphasized in other years. (Kvistad Deposition, at 127)  Dean Kvistad did not meet individually with the plaintiffs to advise them that scholarship would be emphasized more heavily than teaching for the January 2003 merit salary increases. (*Id.*) Kvistad further testified in his deposition, however, that tenure line faculty know at all times that "teaching and scholarship are the activities that they must engage in and do well." (*Id.*)  Plaintiffs admit that scholarship and

publication are important components of their work as faculty members. (Somoza Deposition, at 95; Bornstein-Gomez Deposition, at 141)

Plaintiffs maintain that defendant breached the Faculty Personnel Guidelines because associate professor Watt received a higher merit salary increase than did plaintiffs, and because associate professor Lug received a higher increase than did plaintiff Somoza, even though both Watt and Lug, like plaintiffs, did not publish during the 2001-02 academic year.

Dean Kvistad testified in his deposition that the faculty performance rankings from which the 2003 merit salary increases were derived were based primarily on faculty performance in the 2001-2002 academic year, and on faculty performance during the preceding four to five year period. (Kvistad Deposition, at 124, 127; MSJ Ex. 9) The record establishes that all tenure-line faculty in the Department who received a higher merit increase than plaintiffs published at least twice between 1998 and the end of the 2001-02 academic year, including Watt and Lug. (Kvistad Affidavit, at Ex. 3-E) As discussed previously in this Memorandum Opinion and Order, neither plaintiff published during the 2001-02 academic year; plaintiff Somoza did not publish between 1998 and 2002; and plaintiff Bornstein-Gomez published once between 1998 and 2002. (*Id.*)

Even assuming that a material factual issue remains about whether Dean Kvistad breached the provisions of the Faculty Personnel Guidelines by not providing adequate notice to plaintiffs that scholarship would be emphasized for the 2001-02 academic year (and in ranking Department faculty based on their publications in the four years prior to the

2001-02 academic year), I find that plaintiffs have not pointed to any evidence to show that they suffered an economic loss as a result of the alleged breach.

Plaintiffs contend that if defendant Kvistad had not breached the notice provision in Section 2 they would have received higher increases because they excelled in the teaching category over their Department colleagues. I find that plaintiffs misapprehend what they must establish to prove economic losses flowing from their breach of contract claim. The Faculty Personnel Guidelines do not mandate that teaching be credited more heavily than, or equally with, scholarship, for purposes of assessing faculty performance in the salary review process. Instead, the issue is whether plaintiffs would have produced a publication if they had received the proper notice under Section 2 of the Faculty Personnel Guidelines. Plaintiffs thus must proffer evidence to show that if they had received adequate notice that scholarship would be emphasized for the January 2003 merit salary increase, they each would have published during the 2001-02 academic year, and would have received a higher merit salary increase as a result. However, plaintiffs have not made the requisite prima facie showing. Accordingly, I dismiss plaintiffs' claim for economic damages associated with their breach of contract claim based on Section 2, Faculty Positions of the Faculty Personnel Guidelines.

Plaintiffs next argue that defendants breached "Section 3.3, Annual Review of Faculty Performance, 3.3.1, . . . requiring the chair to use appropriate criteria used for reappointment, promotion and tenure and referencing sections 3.4, 4 and 5." (Plaintiffs' Response, at 44) Plaintiffs represent that the criteria used for salary review are to be consistent with that used in reappointment, promotion and tenure. Plaintiffs maintain that

54

Chair Beaudin used inappropriate criteria in assessing plaintiffs' performance for the academic year 2001-02 because "he based it on teaching graduate students; independent studies; teaching Core classes; and overload classes without pay.  Thus, he violated this section."  (Plaintiffs' Response, at 44)

Section 3.3.1 of the Faculty Personnel Guidelines states: "In preparation for the annual review conference, each faculty member will submit a written summary to the department chair of her/his past year's performance and her/his goals and priorities for the subsequent year.  The report will be based on the appropriate criteria for reappointment, promotion and tenure (see Sections 3.4, 4 and 5)."  Sections 3.4, 4 and 5 of the Faculty Personnel Guidelines are not part of the court's record.  Accordingly, the court is unable to evaluate plaintiffs' claim to determine whether a contract/promise was made, and whether there was a breach by D.U.  I therefore dismiss plaintiffs' breach of contract/ promissory estoppel claim based on Sections 3.3.1, 3.4, 4 and 5 of the Faculty Personnel Guidelines.

Finally, I must dismiss the remainder of plaintiffs' breach of contract claim[23] because plaintiffs did not specifically plead non-economic damages.[24]  Plaintiffs' failure to

---

[23]Plaintiffs claim that defendants breached: (1) Amended Bylaws, Article II.B (providing for open information from the Department Chair on faculty salaries); (2) Faculty Personnel Guidelines, Section 2, Faculty Positions (providing that evaluation of individual for appointment, promotion and tenure decisions will be by Departmental committee "to include appropriate representation of all areas primarily affected by the position"); (3) the former Bylaws when Chair Beaudin failed to give proper notice of his intent to amend the Bylaws in May 2002; (4) Amended Bylaws, Article IV.D (providing for annual Department faculty evaluations of Department Chairpersons); (5) Faculty Personnel Guidelines 2.1.3, 2.1.4, 3.2 and 4.1 (pertaining to faculty appointments) during the hiring processes involving Wendy Mendez; and, (6) that Chair Beaudin violated the Amended Bylaws, as discussed at p. 16, *supra*.

[24]Plaintiffs do not allege any economic losses in connection with their breach of contract claim, excepting their claim pertaining to the 2003 merit pay increases.

specifically plead non-economic damages for the alleged violation of Section 2, Faculty Positions, is fatal to that claim as well, even assuming that plaintiffs can show a breach of that provision.

Proof of damages is an essential element of a breach of contract claim. *Western Distrib. Co. v. Diodosio*, 841 P.2d 1053 (Colo.1992). A willful or wanton breach will support an award of damages for emotional distress, if such distress is a "natural and probable consequence of the breach." *Trimble v. City & County of Denver*, 697 P.2d 716, 731 (Colo.1985); *see, also, Giampapa v. American Family Mut. Ins. Co.*, 64 P.3d 230, 238 (Colo.2003); *Brossia v. Rick Const., L.T.D. Liability Co.*, 81 P.3d 1126, 1131 (Colo.App.2003)(non-economic damages, such as emotional distress damages, are available in breach of contract actions only in extraordinary contractual circumstances where such damages are foreseeable at the time of contracting); CJI-Civ. 4th 30:35.

In *DerKevorkian v. Lionbridge Technologies, Inc.*, 2006 WL 197320 at *4 (D.Colo. 2006)[25], Chief District Judge Babcock held, in an unpublished decision, that non-economic damages on a breach of contract claim constitute special damages under Colorado law which must be specifically pleaded and proved. *See, also, Bueno v. Denver Pub.Co.*, 32 P.2d 491, 496 (Colo.App. 2000), *over-ruled on other grounds* (holding that special damages, which are not the usual and natural consequence of the wrongful act complained of, must be specifically pleaded); C.R.C.P. 9(g)("When items of special damage are claimed, they shall be specifically stated.") Chief Judge Babcock concluded

---

[25]A copy of *DerKevorkian* is attached to the Memorandum Opinion and Order.

that a plaintiff's general allegations that she  "suffered damages in an amount to be determined at trial" as a result of the breach of contract, and her request for unspecified "compensatory economic and non-economic damages" in a general prayer for relief were insufficient to constitute specific allegations that the defendant's breach rose to the required level of wilful and wanton behavior or that the plaintiff suffered any particular emotional distress damages because of the breach.  *Id.* at *4.

In this case, plaintiffs did not specifically allege a wilful and wanton breach of contract, nor did they plead emotional distress damages in connection with their breach of contract claim.[26]  Instead, they allege that they were "harmed and damaged in an amount to be proven at trial" by defendants' breach of the contract, and they requested damages for "pain, suffering and humiliation, in amounts to be determined at trial." Amended Complaint, ¶79, Prayer for Relief, ¶D.   I agree with Chief Judge Babcock's reasoning and the decision in *DerKevorkian*.   Accordingly, all of plaintiffs' breach of contract claims are subject to dismissal because they are dependent upon non-economic damages.     Further, to the extent plaintiffs wish to proceed under a promissory estoppel theory, non-economic losses are not recoverable. *See Zick v. Krob*, 872 P.2d 1290, 1295 (Colo.App. 1993)(holding that the proper remedy in a promissory estoppel action is "damages awarded in a sufficient amount to compensate for the actual loss sustained");

---

[26]I denied as untimely plaintiffs' verbal request to amend their complaint to allege special damages in connection with their breach of contract claim during the May 15, 2006 oral argument. Plaintiffs conceded that they learned about the special damages during the discovery process, but did not include that information in their amended complaint filed November 21, 2006, nor did they seek leave to amend their complaint a second time before or at the close of discovery on December 31, 2005.

*DerKevorkian*, 2006 WL 197320 at *5 (concluding that plaintiff could not recover non-economic damages on her promissory estoppel claim).

To summarize, I dismiss plaintiffs' breach of contract/promissory estoppel claim in its entirety. Some of the statements plaintiffs rely upon are nothing more than vague assurances. To the extent plaintiffs can show a breach of contract pertaining to their 2003 merit salary increases, they have failed to make a prima facie showing of economic loss, and they did not specifically plead either a wilful and wanton breach of contract or non economic losses. Finally, the remainder of plaintiffs' breach of contract claim fails because damages are an essential element of plaintiffs' claim and plaintiffs did not specifically plead non economic damages.

<div align="center">IV.</div>

For the reasons set forth above, it is

**HEREBY ORDERED** that Defendant's Motion for Summary Judgment, filed February 23, 2006, is **GRANTED**. It is

**FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE**. It is

**FURTHER ORDERED** that each party shall pay his, her and its own costs and attorney's fees.

Dated August 31, 2006.

BY THE COURT:

s/ Patricia A. Coan
PATRICIA A. COAN
United States Magistrate Judge